## Ross vs. The Board of Supervisors of Outagamie Co., impleaded with Johnston and Morrow.

Where a person settled, prior to July 6th, 1853, upon a part of one of the even numbered sections, selected by the governor under the act of Congress of March 2d, 1849, to make up the quantity of land due to the state, under the act of Congress of August 8th, 1846, granting lands for the improvement of the Fox and Wisconsin rivers, and in December, 1854, claimed a right, by virtue of such settlement, to purchase said land of the Fox and Wisconsin Improvement Company, (to which the state had transferred its interest in said grant, with a reservation of the right of pre-emption to settlers thereon,) *proved* his right, and paid said company for such land, and took a certificate of the purchase thereof: *Held*, That he acquired an interest or estate in such land, which was liable to taxation as real estate, in the year 1855, under the laws of this state, although from the failure of the President to approve the selection of such even numbered sections, the legal title thereto did not become vested in the state or its assigns until congress, by act of June 9th, 1858, enacted, that the even numbered sections so selected, and which had been sold by the state or its assigns, should be *confirmed* to said state as *part* of said grant made by the act of August 8th, 1846, and the title of the purchasers should be valid, as though said selection had been made in conformity to law. Dixon, C. J., *dissenting.*

A statement in memorials addressed to congress by the legislature of Wisconsin in 1854 and 1856, that said even numbered sections were *not* liable to taxation, cannot be received to control the judgment of the court, when it is clearly of opinion that the law was otherwise.

APPEAL from the Circuit Court of *Outagamie* County.

This was an action to set aside a tax certificate issued upon a sale of a quarter section of land in the county of Outagamie, for the non-payment of taxes assessed for the year 1855, and to restrain *Johnston*, the clerk of the board of su-

pervisors, from executing a deed for said land to the defendant, *Morrow*, who was alleged to be the holder of the tax certificate. The principal question in the case was, whether the land referred to in the complaint was subject to assessment for town, county and state taxes, in the year 1855.

The facts in the case, as they appear from the finding of the circuit court, are substantially as follows : By an act of congress, approved August 8th, 1846, there was granted to the state of Wisconsin, on its admission into the Union, for the purpose of improving the navigation of the Fox and Wisconsin rivers, &c., " a quantity of land, equal to one half of three sections in width, on each side of the said Fox river and the lakes through which it passes, &c., reserving the *alternate* sections to the United States, to be selected under the direction of the governor of said state, and such selection to be *approved* by the President of the United States. * * *Provided*, the said alternate sections reserved to the United States shall [should] not be sold at a less rate than two dollars and fifty cents the acre."

The state of Wisconsin accepted said grant, and the *odd* numbered sections within the territorial limits of the grant, were selected under the direction of the governor, and the selection approved by the President. The United States had, however, sold part of the odd numbered sections so selected by the state, and congress, by an act approved March 2d, 1849, authorized the governor " to select the same quantity of other lands in lieu thereof; subject, however, to the approval of the President." In the month of June, 1849, the governor, in order to make up the deficiency in the quantity of land due to the state under said act of congress, selected, among other tracts, the quarter section of land referred to in the complaint, being part of one of the *even* numbered sections within the territorial limits of said grant, which selection the President of the United States did *not* confirm or approve.

By an act, approved July 6th, 1853, the legislature of Wisconsin incorporated a company, under the name of the " Fox and Wisconsin Improvement Company," to complete the improvement of said rivers, the fourth section of which

Jan. Term,
1860.

Ross
v.
Supervisors
Outagamie
County.

act declares, that the lands granted by congress in aid of said improvement, and remaining unsold, should be, and were thereby, granted to the Fox and Wisconsin Improvement Company, upon certain terms and conditions; that all the lands so granted to said company should be exempt from taxation of every description, under any law of this state, until after the same should have been sold and conveyed, or contracted to be sold, or leased, or improved, by said company; *Provided,* said exemption should not continue longer than ten years; that any person who might have acquired the right of pre-emption under the laws of this state, or of the United States, to any portion of said lands, or had settled thereon in his own right, prior to the passage of that act, should be entitled to purchase the same of said company, at the minimum price of one dollar and twenty-five cents per acre; and that it should be the duty of the governor to take every necessary means to obtain, at as early a day as possible, the lands theretofore selected, and such as might thereafter be located by the company for the balance of the grant in aid of said improvement.

On the 25th of December, 1854, the plaintiff claimed the right to purchase the land referred to in the complaint, of the Fox and Wisconsin Improvement Company, at the price of one dollar and a quarter per acre, by virtue of a settlement made thereon by him, in his own right, prior to the 6th day of July, 1853, and on the said 25th of December, 1854, *proved up* his right to purchase said land at that price, before the proper officers of said company, paid the purchase money, being two hundred dollars, and received from the proper officer of the company a receipt therefor, stating that it was "in full" for said land.

On the 1st of March, 1854, the legislature of the state of Wisconsin adopted a memorial to Congress, in which it was represented, that the even numbered sections of land on the Fox river, in the state of Wisconsin, and within three miles of said river, were reserved from sale in the year 1848, for the purpose of being donated to the state of Wisconsin, for the improvement of the Fox and Wisconsin rivers; and that with such expectation settlers went on to said lands,

and made large and valuable improvements : that such improvements or lands were not subject to taxation for any purpose whatever; and that such settlers were very desirous of obtaining titles to said lands; wherefore the memorialists prayed, that said lands should be brought into market, either by the general government, or by donation to the state of Wisconsin, to be disposed of as the state should see fit; and that all of said settlers on said lands might have the right of pre-emption, who should reside on said lands, or have improvements on the same to the amount of fifty dollars, at the time of the passage of a law (by congress) on said subject.

On the 10th of October, 1856, the legislature adopted another memorial to congress, in which, after making the same statement contained in the former memorial, as to settlements and improvements upon said even numbered sections of land, and that such improvements or lands were not subject to taxation for any purpose whatever, it was further represented, that, at the time such settlements were made, it was generally believed that the selection of such even sections would be confirmed to this state, and the settlers therefore entered upon them in undoubted good faith, as pre-emptors under the laws of this state; that the said settlers were subjected to great inconvenience, and in many cases to serious loss, in consequence of the want of title to their homes, and looked to congress as the only power to grant them relief; that the *even* sections had always been treated by the general government as a part of the grant made for the improvement of the Fox and Wisconsin rivers; and that, although the selection of such *even* sections had never been confirmed, the state had never yet been permitted to select other lands in lieu of them; wherefore the memorialists prayed congress to pass a law confirming the said selection of said even numbered sections, made by the state under the said grant, upon condition that said lands should be secured to the settlers thereon at a price not exceeding ten shillings per acre.

On the 9th of June, 1858, congress passed an act, entitled "an act for the relief of certain settlers on the public lands in the state of Wisconsin," by which it was enacted, "that

Jan. Term,
1860.

Ross
v.
Supervisors
Outagamie
County.

so much of the even numbered sections of land, selected by the state of Wisconsin in the month of June, in the year eighteen hundred and forty-nine, to satisfy the quantity of land due said state under the act of congress of August 8th, eighteen hundred and forty six, granting land in aid of the improvement of the Fox and Wisconsin rivers, as *have* been sold or contracted to be sold by said state, or its assigns, under the laws thereof, *are* hereby confirmed to said state as parts of said grant, and the title of the purchasers declared to be valid, as though the said selections had been made in conformity with law;     *     *     *Provided*, that a schedule duly certified by the governor, of the lands sold and contracted to be sold, prior to the passage of this act, shall be filed in the general land office, within six months from the date of this act."

Within six months from the date of said act of congress, the schedule required by said proviso was filed in the general land office, containing the tract of land in the complaint described, and on the 26th of January, 1859, the plaintiff received a conveyance of said land from the Fox and Wisconsin Improvement Company, in compliance with the receipt or certificate of purchase thereof, above mentioned. It was also found by the circuit court, that the United States had never disposed of said tract, except by the several acts of congress above mentioned, and the proceedings had thereunder.

The court found, as conclusions of law, that the title to the land in the complaint mentioned, was in the United States at the time it was assessed for taxes in 1855 ; that the assessment and sale for taxes were illegal and void ; that the issuing of the tax deed would create a cloud on the plaintiff's title ; and that the plaintiff was entitled to a perpetual injunction against the execution of such tax deed. To these conclusions of law the defendants excepted, and judgment being rendered in accordance therewith, the board of supervisors of the county of Outagamie appealed.

*George H. Myers*, for appellant, contended, that the plaintiff had an estate in the land, which was taxable at the time the tax was levied. Our statutes declare all property, real

Jan. Term,
1860.

Ross
v.
Supervisors
Outagamie
County.

and personal, not expressly exempt from taxation, to be taxable. If a citizen owns an estate in land, of which the fee is in the government, that estate is taxable. Thus, lands are taxable as soon as entered, and the title conveyed by the patent relates back to the time of the entry. 15 Ohio, 367; 3 McLean, 107; 7 Ohio, 156. The article in our constitution, which provides that no tax shall be levied upon land, the property of the United States, is only the assent of this state to be bound by a law of congress, and if the United States has consented to the taxation of this land by the state, the tax is legal. Congress, by the act of June, 1858, confirmed the land to the state as part of the grant of 1846, and declared the title of the settlers to be valid, as though the selections of 1849, had been made in conformity to law, and the president, in approving the act of 1858, has approved the selections of 1849, within the spirit and meaning of the act of 1846. By the act of 1858, congress consented to the construction placed by the governor of Wisconsin upon the act of 1846, and consented to the disposition the state had made of the land.

The act of 1846 contained words of grant; the act of 1858 only words of *confirmation*, and the lands are confirmed to the state *as part of the grant made by the act of* 1846.

The Fox and Wisconsin Improvement Company, by selling the land to the plaintiff, estopped itself from denying that it owned the land, and by its charter the land became taxable the moment the contract of sale was made. The plaintiff took the land subject to that estoppel. *McLary vs. Ramson*, 19 Ala., 430; *Coakley vs. Perry*, 3 Ohio St. Rep., 344; *Phelps vs. Blount*, 2 Dev., N. C., 177. The plaintiff, by claiming the land of the company, proving up his right thereto, paying for it and accepting a duplicate, is estopped from denying that the company had title, especially since he has procured a conveyance of the land from the company by virtue of that purchase, and now holds it under the title so acquired. *Fitch vs. Baldwin*, 17 John., 161; *Jackson vs. Ayers*, 14 id., 223; *Bond vs. Swearingen*, 1 Ham., 182; *Thomas vs. Marshall*, Hardin, 19; *Sayles vs. Smith*, 11 Wend., 57; *Riley vs. Million*, 4 J. J. Marsh., 395; *Harle vs. McCoy*, 7

Jan. Term,
1860.

Ross
v.
Supervisors
Outagamie
County.

id., 318; *Chiles vs. Jones,* 4 Dana, 479 ; *Miller vs. Shackleford,* id., 264; *Bliss vs. Smith,* 1 Ala., 273 ; *Ogden vs. Walker's Heirs,* 6 Dana, 420 ; *Love vs. Edmonston,* 1 Ire. Law R., 152 ; *Bullen vs. Mills,* 29 Eng. C. L. Rep., 16.

If the lands are not taxable, the deed would be utterly void, and an injunction is unnecessary. 4 Barb. (N. Y.) Rep., 16 ; 6 John. Ch., 27 ; 4 id., 352. The memorials of 1854 and 1856 do not estop the state from claiming that the lands were taxable. They were not acts of legislation, nor were they binding on the state. The government is never estopped. *Owen vs. Bartholomew,* 9 Pick., 520.

*James H. Howe and Norris,* for respondent :

I. The state possesses the sole power to declare what is and what is not taxable. In the two memorials offered in evidence, the legislature declared that the land referred to in the complaint was not liable to taxation.

II. The title to the land was in the United States, at the time of the taxation and sale by the county. This court, in the case of *Veeder vs. Guppey,* 3 Wis., 520, decided that by the act of congress of 1846, the state became seized of one half of the land within three miles of Fox river, and that the United States retained title to the residue. The land in question, being part of that residue, was therefore not granted to the state by the act of 1846. It is not pretended that congress has passed any other act in any manner affecting the title, excepting the act of June 8th, 1858, nor is it pretended that the title has ever been conveyed by patent. It follows that the title must have remained in the government of the United States until that act was passed. The counsel for the appellant seeks to escape this conclusion, by contending that the act of 1858 is a mere " confirmation of a pre-existing title," and therefore has relation back to a time prior to the imposition of the taxes referred to. To make the act of 1858 operate as a confirmation of a title, there must have been some pre-existing title on which it could operate. A confirmation is a conveyance of an estate or right *in esse,* whereby a voidable estate is made sure and unvoidable, or whereby a particular estate is increased. 2 Black. Com., 325. But the Fox and Wisconsin Improvement Company

could not give any title to the respondent which they did not themselves possess. They derived all their title from the state, and we have already seen that the state took no title to the land in question by the act of 1846. Besides, the state never made any claim to the title, but on the contrary, by the memorials of 1854 and 1856, expressly disclaimed any title to the land and any right to tax it. The respondent, therefore, had no title upon which a confirmation could operate.

III. The general doctrine governing estoppels *in pais* is, that a party is usually concluded by admissions or conduct upon which others have been induced to act, when, if he were permitted to prove that such admissions or conduct were false, such permission would operate as an injury to the persons who were influenced by them. *Welland Canal Co. vs. Hathaway*, 8 Wend., 483; 1 Phillips on Ev., C. and H.'s notes, 460, and cases there cited. But the estoppel prevails only in favor of the person who has been drawn in by the false act or representation, and he must show affirmatively that his own conduct was controlled or influenced by such false representation or act. *Copeland vs. Copeland*, 28 Maine, 525; Phillips on Ev., *supra*.

There is no proof showing any claim of *title* by the respondent, or a single act or representation of his by which the authorities of the county of Outagamie could have been misled. The company did not claim to have a title at the time of the contract with the respondent, but only gave him, at most, an agreement to convey the land to him at a future time.

To the point that the state took no interest, under the act of 1846, in any particular tract of land, until after its selection and approval, respondents' counsel cited *Lessieur et al. vs. Price*, 12 How. (U. S.) 59; *Rutherford vs. Green's heirs*, 2 Wheat., 196; *Landes vs. Brant*, 10 How., 374; *Stoddard vs. Chambers*, 2 How., 284; *Bissell vs. Penrose*, 8 How., 317.

To the point that improvements made upon the land of another with his assent, express or implied, are personal property and liable to levy and sale as such, they cited *Wells vs. Banister*, 4 Mass., 514; *Ashman vs. Williams*, 8 Pick.,

Jan. Term, 1860.

Ross v. Supervisors Outagamie County.

Jan. Term, 1860.

Ross
v.
Supervisors
Outagamie
County.

June 4.

402; *Rogers vs. Woodbury*, 15 Pick., 156; *Curtiss vs. Hoyt*, 19 Conn., 154; *Marcy vs. Darling*, 8 Pick., 283; *Doty vs. Gorham*, 5 Pick., 487; *Aldrich vs. Parsons*, 6 N. H., 555; *Lyddall vs. Weston*, 2 Atk., 19; § 5, chap. 15, Rev. Stat. of 1849.

*By the Court*, COLE, J. The leading question which we have to consider in this case is, had the respondent, at the time the land mentioned in the pleadings was taxed, an interest or estate therein, which was liable to taxation by the laws of this state? This is understood to be a question of considerable public interest, on account of its bearing upon the legality of a large amount of taxes which have been levied upon lands similarly situated, in counties lying along the line of the Fox and Wisconsin improvement.

The tract is a part of one of the even sections, within the limits of the grant made by congress to the state, by the act of August 8th, 1846. It is well known that the governor, upon the acceptance of the grant by the state, and in its behalf, selected, under the provisions of the act, the unsold lands in the odd numbered sections within the limits of the grant, as those which the state would take under the act aforesaid, and that this selection was approved by the general government. In June, 1849, the governor also, under the act approved March 2d, 1849, (9 U. S. S. at large, p. 352,) which authorized him to select the same quantity of other lands, in lieu of the odd numbered sections which had been sold by the United States subsequent to the act of 1846, selected, among other lands, the tract mentioned in the complaint in this case. The next legislation by congress upon the subject, was the passage of the law of June 9th, 1858, (11 U. S. S. at large, p. 313,) the first section of which declared, "that so much of the even numbered sections of land selected by the state of Wisconsin in the month of June, in the year eighteen hundred and forty-nine, to satisfy the quantity of land due said state under the act of congress of August, eighteen hundred and forty-six, granting land in aid of the improvement of the Fox and Wisconsin rivers, as have been sold or contracted to be sold, by said state or its assigns, under the laws thereof, *are hereby confirmed to said state* as

parts of said grant, and the title of the purchasers declared to be valid, as though the said selections had been made in conformity with law; provided," &c.

Jan. Term,
1860.

Ross
v.
Supervisors
Outagamie
County.

On the 25th of December, 1854, the respondent applied to the Fox and Wisconsin River Improvement Company, to which the state had assigned its interest in the grant, to purchase the tract at $1.25 per acre, by virtue of a settlement in his own right, made on said land in the year 1849, proved up his right to the same according to the provisions of the charter of the company, and to the satisfaction of the officers thereof, paid the company two hundred dollars, and took a duplicate receipt, and after the passage of the act of June, 1858, received a deed of the land from the company. The land was assessed for taxes for 1855, and was forfeited, and the complaint was filed to set aside the tax certificates given upon the sale, as constituting a cloud upon the title, and to restrain the officer from giving a tax deed, &c. The ground upon which the respondent relies to sustain his complaint is, that the land was not rightfully subject to taxation in 1855, nor until after the passage of the act of 1858, since, up to that time, the title to the same was in the United States. We think this position unsound, and that it cannot be successfully maintained. Sections 1 and 2 of chap. 15, R. S., read: "All property, real and personal, within this state, not expressly exempted therefrom, shall be subject to taxation in the manner provided by law.

"Real property shall, for the purposes of taxation, be construed to include the land itself, and all buildings, fixtures and other improvements thereon, and all mines, minerals, quarries and fossils in and under the same; and the terms 'land' and 'real estate,' when used in 'this chapter, shall be construed as having the same meaning as the term 'real property.'"

Had the respondent such an interest or estate in the land in 1855, as to be subject to taxation within the intent and meaning of these provisions of law? That he himself believed that he had, at that time, some valuable beneficial interest in the land, his conduct in reference to the same most conclusively shows. Else why did he prove his settlement

Jan. Term,
1860.

Ross
v.
Supervisors
Outagamie
County.

upon this land in 1849, and claim the right to purchase the same of the company at $1.25 per acre? Why did he give the improvement company two hundred dollars, and take a receipt which read that this sum was in "full for the northeast quarter of section No. 30, township 21 north, of range No. 17 east, containing 160 acres — hundredths, at the rate of $1,25 per acre, subject to any valid right of pre-emption?" Does this not show that he then supposed he was bargaining for some valuable interest in that property? Does it not show that he in fact purchased all the interest of the company in the same, whatever that interest was, legal or equitable, inchoate or perfect? There is but one answer to be given to these interrogatories. The respondent unquestionably then supposed that he was securing, or had secured, some valuable right or interest in the quarter section. Was he mistaken in this idea? We think not. Undoubtedly he then had but an inchoate and imperfect title. The perfect legal title, the fee, had not passed out of the United States. But that he had a valuable present right and interest in the land, an interest that the laws of the state recognized and protected, an interest that congress subsequently confirmed and made absolute, by declaring the respondents' title thereto "to be valid as though the said selections had been made in conformity to law," cannot be denied. Was this interest or estate subject to taxation? In other words, was it "real property," "land," "real estate," within the meaning of sections one and two of chapter 15? If so, the legislature has declared it subject to taxation, unless expressly exempted therefrom.

Section 9 of the chapter which prescribes the rules to be observed in the construction of statutes, unless such construction would be inconsistent with the manifest intent of the legislature, reads as follows: "The words 'land' or 'lands,' and the words 'real estate' and 'real property,' shall be construed to include lands, tenements and hereditaments, and all rights thereto and interest therein." Chap. 4, R. S., 1850. The words "real property," "land," "real estate," as used in sections one and two of chapter 15, it is clear, were intended to have the same sense and meaning as it is declared in sec. 9, chap 4, these words shall be construed and deemed to have.

That the respondent had a right to this tract of land assessed for taxes, and an interest therein, is, we think, most demonstrably clear and certain.

The circuit court held, because the legal title to the land was in the United States at and before the assessment and laying of the tax, that therefore the state could not rightfully impose any tax upon it. We have assumed all along that the fee did not pass out of the United States until the passage of the act of June, 1858, and such we think was the case. But it by no means follows that the state did not acquire a right to and an interest in this land, when the governor selected it under and by virtue of the act of March 2d, 1849. The governor was authorized by that act to select the same quantity of other lands to make up for the deficiency in the amount due the state by the act of 1846. He selected this tract. His selections were, however, subject to the approval of the President. For some reason, the President did not approve of his selections. If he had, the grant would have become operative, and the title in fee would have vested in the state. In 1858 congress did away with the necessity for this approval of the President, by confirming the title to these selections, in the state, or in the purchasers from the state.

But it was insisted by the counsel for the respondent, that the state, or the improvement company, or its assigns, acquired no right or title whatever to the lands selected by the governor, until the passage of the act of 1858; and that the right and title to these lands remained perfect in the general government up to that time. This, however, we deem an erroneous view of the effect of the legislation of congress upon this subject, and an entire misapprehension of the intent and object of the act of 1858. For clearly, that act goes upon the assumption, that some right or interest in such lands had been acquired by the state, and sold, or contracted to be sold, by said state or its assigns, and then proceeds to confirm that right, and declare the title of the purchasers valid. The title thus confirmed related back to the selections of 1849. It appears to us that this is the true and correct construction of the act of 1858.

Jan. Term,
1860.

Ross
v.
Supervisors
Outagamie
County.

But again, is it true that the state cannot impose a tax upon any land while the fee to the same is in the United States? It is conceded that so long as the land remains a part of the public domain of the general government, it is not subject to taxation. For if the state would otherwise have had the right to impose a tax upon land, the property of the United States, this right is expressly relinquished by sec. 2, art. 2, of the constitution. But how is it with respect to lands purchased by an individual of the general government? Are they not subject to taxation in this state until the patent issues? As a general rule, as soon as the public land is purchased and paid for, it becomes the property of the purchaser, and is sold and conveyed before it is patented. The receiver's receipt, or certificate of purchase, is made evidence of title by statute. Now, if the land is not liable to be taxed until the fee passes out of the general government, and becomes vested in the purchaser, the owner only needs to neglect or avoid calling for the patent, and he may thus, through all time, avoid the payment of taxes. In the absence of all authority upon the question, I should be slow in adopting such a conclusion, but the following cases show that this is not the law: *Carroll vs. Safford*, 3 How. U. S., 441; *Astrom vs. Hammond*, 3 McLean, 107; *Carroll vs. Perry*, 4 id., 25; *Gwynne vs. Niswanger*, 15 Ohio R., 367.

But it was further insisted that the legislature, by the memorial to congress, approved March 1st, 1854, expressly declared that the land was not subject to taxation, and it is contended that this declaration is conclusive upon the question. Had the legislature attempted to give a construction to chapter 15, R. S., 1850, and to determine what property by that law was subject to taxation, such construction might have been entitled to some consideration; but this it did not do. The attention of the members of the legislature was probably not generally called to the language of that memorial, and when we consider the manner in which such things are passed, it is not too much to say, that they are not entitled to any weight with a court upon a question of this nature. Certainly the expression in that memorial, that the lands therein referred to "are not subject to taxation for any

purpose whatever," cannot be binding upon our judgment, when we are clearly of the opinion that the law is otherwise.

These observations, it is believed, sufficiently dispose of all questions necessary to be noticed.

The judgment of the circuit court must be reversed, and the cause remanded for further proceedings in accordance with this decision.

Jan. Term, 1860.

Ross
v.
Supervisors
Outagamie
County.

DIXON, C. J. The majority of the court concede that the legal title to the land in question, was, at the time of the supposed levy and assessment of the tax, in the government of the United States, but they say that it was affected by an interest or trust in favor of the respondent, which made it taxable. How that interest or trust arose, or what was its exact nature or extent, is not very clearly and accurately explained. It is also conceded, as I understand the opinion, that if the title was at that time unaffected by any such interest or trust, then the land could not have been taxed. This, in my judgment, was its precise condition, and, therefore, I think the levy and assessment were void.

It is not claimed that any title or interest in the even numbered sections passed to the state by virtue of the act of August 8th, 1846, and of the selection made by the governor under its provisions. By the express language of the grant, the alternate sections were reserved to the United States, and after the governor had selected the odd-numbered sections, the title to the even-numbered ones, of which the land in question was a part, became, so far as that act was concerned, unalterably fixed in them. There can, therefore, be no doubt that the United States remained the absolute and unqualified owner down to the passage of the act of March 2d, 1849. That act assumed not only this absolute and unqualified ownership, but also the right of the United States to confirm entries of the odd-numbered sections, made subsequent to the passage of the act above referred to. It reads: "That all land entries made in the Green Bay land district, in the State of Wisconsin, upon the odd-numbered sections of the Fox and Wisconsin River reservation, in said

Jan. Term, 1860.

Ross
v.
Supervisors
Outagamie
County.

state, subsequent· to the passage of an act entitled 'An act to grant a certain quantity of land to aid in the improvement of the Fox and Wisconsin Rivers, and connect the same by canal, in the Territory of Wisconsin,' approved on the eighth day of August, eighteen hundred and forty-six, be, and the same are hereby declared to be good and valid as though said act had not been passed: Provided, nevertheless, that the governor of said state is hereby authorized to select the same quantity of other lands in lieu thereof; subject, however, to the approval of the President of the United States."

The object of its enactment was twofold—to establish the titles of settlers, who had made entries of the odd-numbered sections, and to provide a method for supplying the deficiency thus occasioned, by selections to be made elsewhere. The power of the governor, under the previous act, having been already exhausted by a choice of alternate sections, according to its terms, it was considered, and no doubt correctly, that without this further authority, he could not select elsewhere, and thus the grant would remain in part unexecuted. This authority was, however, expressly made subject to the approval of the President. The act of approval was voluntary. The President could give or withhold his assent at his pleasure; and if he refused, there was no power to compel him. The grant itself being in the nature of a mere gratuity or gift, and the United States the granting power, it is clear that congress could impose such conditions and restrictions as to its effect, and the manner of its execution, as it · saw fit. One of those conditions was, that the President should approve the selections to be made by the governor. Both selection and approval were made necessary to give the state a vested interest in any specific tract of land. Without either, the grant was, as yet, unexecuted; and there would, in my opinion, be as much propriety in saying that a specific interest in the land in question passed to the state, and through the state to the improvement company, without selection, as without approval.

The question here presented differs from that decided by this court, under the original act, in the case of *Veeder vs.*

*Guppey*, 3 Wis., 502. Under that act, the interest of the state was fixed and certain. The quantity of land to which the state was entitled, as compared with the entire tract from which selection was to be made, was clearly ascertained. It was each alternate section, or one-half the entire tract. Its location and boundaries were accurately defined. It was three sections in width on each side of the Fox river, and the lakes through which it passes, from its mouth to the point where the canal should enter the same, and on each side of the canal from one river to the other. Under the act we are now considering, these things were not so. The interest of the state was indefinite and uncertain. The amount of land to which it was entitled, as compared with that from which it was to be chosen, was entirely undefined, and depended for ascertainment upon the investigation of a question of fact, namely, the number of acres of the odd-numbered sections which had been entered at the land office. Its location was not fixed. It might have been selected near the point of junction with the canal, or midway along the river, or near its mouth, according to the extent of the deficiency and various other influencing circumstances. The rights of the state not being ascertained by the law, the selection by the governor and approval by the President, were not mere acts of partition, but of conveyance, and were indispensible to the transfer to the state of any specific title. There were, therefore, very material reasons for reserving this power of approval to the President, and why the title should not pass until his assent, or that of congress, should be given.

The grant which had, upon partition, resulted in a transfer to the state of the odd-numbered sections, was, by reason of the entries of a portion of them, partially defeated; and the combined operation of the two acts was to give the governor, subject to the approval of the President, the right to select from the even-numbered sections still belonging to the United States, a sufficient quantity of land to make up the deficit. This was not a right to any particular parcels or sections, but a right generally to have that quantity of land out of the even-numbered sections within the reserva-

Jan. Term,
1860.

Ross
v.
SUPERVISORS
OUTAGAMIE
COUNTY.

tion, to be selected with the assent of the President. It was a right which rested in compact, merely, and depended for its execution upon the political authorities of both governments. Until that was done, there was nothing of which the courts or taxing officers of the state could take cognizance as the specific subject of the grant. It could not be marked out or defined. Prior to such execution, the government of the United States was at liberty to make such disposition of the lands as it pleased; and if, instead of confirming the tract in question to the state and its assigns, it had, on the 9th of June, 1858, transferred it to another; or if, up to the present time, it had entirely refused to dispose of it, can there be any doubt that the tax must have been held void? I will almost hazard the assertion, that if the case had been like either of these, even my brethren would have had some doubts as to its legality. Is the case now presented, in reality different? If the title were still in the United States, as it was in 1855, when the tax was assessed, would it change the legal aspects of the case, could the court know that three years hence it would be transferred to the state and those claiming under it? It seems clear to me that it would not, and that such considerations should have no influence upon the question. And yet such is the effect which has been given to the act of congress passed three years after the tax was levied. Upon the same principle, it is difficult to perceive why all the lands of the United States, within the reservation, were not taxable, on the supposition that they might some time become the property of the state or its assigns. This, I insist, is a gross and palpable error, which has its origin in overlooking the fact that, for all practical purposes, the United States were still invested with the complete and absolute title and dominion of all the lands, subject, it is true, to the compact, which, though it bound the public faith, was practically inoperative, because, until executed by the political authorities, it had no object to which it could attach. The claim of the state was like those general reservations sometimes found in cessions of land by the Indian tribes; or the rights of the states to the sixteenth sections for the use of schools; which, until

location or survey, are ineffectual to convey any specific interest. See *Gaines vs. Nicholson*, 9 How. (U.S.), 356; and *Cooper vs. Roberts*, 18 id., 173.

The selections of the governor under the act of 1849,were, as we are informed, made in that year. They were never approved by the President. From that time until 1858, running through a period of two entire administrations, and a portion of a third, the President steadily refused to sanction them. On the 9th of June, 1858, congress, in part, adjusted the matter, not by ratifying the selections, but by declaring the title of the purchasers "to be as valid *as though the said selections had been made in conformity to law: Provided*, That nothing contained in this act shall be construed to increase the quantity of land to which the state is entitled under the grant aforesaid: *And provided further*, That a schedule, duly certified by the governor, of the lands sold, or contracted to be sold, prior to the passage of this act, shall be filed in the General Land Office within six months from the date of this act." The act is entitled "An act for the relief of certain settlers on the public lands in the state of Wisconsin."

Nothing can be plainer from the face of this act, the residue of which is quoted in the opinion of the court, than that the object of congress was not to aid the selections of the governor, which are asserted not to have been made "in conformity with law," but to help the unfortunate settlers, who had entered upon the lands, made improvements, and paid the price to the state or the improvement company, under the mistaken belief that they were the owners, to a title which it was otherwise certain they could not obtain. It was an act of grace or favor to such supposed purchasers, of whom the respondent was one, and was not intended as a recognition of any previous rights or interests in the state or the improvement company. The existence of such rights or interests is expressly ignored; and it seems idle to emphasize the word "confirmed," when the very next lines, in the connection, negative the impression sought to be established by it, and show that whatever technical effect may be

Jan. Term,
1860.

Ross
v.
SUPERVISORS
OUTAGAMIE
COUNTY.

Jan. Term,
1860.

Ross
v.
Supervisors
Outagamie
County.

given to it when used in merely private conveyances, none such was here intended.

The selection by the governor was but one step towards the execution of the compact, and availed nothing unless it was met by the approval of the President. Clearly it was worthless as an evidence of title, after the President had refused, which must be presumed after a silence of six years, from 1849 to 1855. There was, therefore, at that time, not the slightest foundation for any right or title to this particular tract of land, either in the state, the improvement company, or the respondent. The United States were at liberty to grant it to others, or retain the title at their pleasure. There were no considerations of public faith to prevent them from doing either. The President, by his refusal to approve, had absolved them from all such obligations, and, in effect, requested the governor to select elsewhere, as he might have done. How, then, this undefined interest or equity, which the majority of the court seem to suppose was at that time vested in the respondent, arose, is more than I can see. It certainly did not exist with the consent of the United States, who alone could create it. It was the interest of every mere trespasser upon the public domain—neither more nor less— and if that makes the lands of the United States taxable, the decision of the majority is correct; otherwise, in my judgment, it is not.

It is stated as evidence of title in the respondent, that he believed the improvement company were the owners, and applied to them to purchase, paid the price, and received a duplicate for the land. To this position the opinion furnishes its own answer. We sit here to decide the law as we find it, and not as the parties or others may have supposed it to be. If the erroneous recitals of the legislature in a memorial to congress cannot conclude us, surely the mistaken belief of a private individual ought not to do so. The respondent acquired no interest, until congress saw fit to give it to him, and his belief did not affect the question.

It is also said that the act or confirmation of congress in

Jan. Term,
1860.

Ross
v.
Supervisors
Outagamie
County.

1858, related back to the selections of 1849. This is not sustained by a fair construction of its language. As has been already observed, congress did not attempt to ratify the selections, but to validate the title of the purchasers of such lands as had then been sold, or contracted to be sold, by the state or its assigns, not exceeding the quantity to which the state was entitled under the grant. If there were any lands selected, but not sold or contracted to be sold, as to them no title passed. The selections were considered as not in conformity with law, and congress seem studiously to have avoided their confirmation. The President had refused to approve them, and it was as if they had never been made. They were mentioned, it is true, but only as descriptive of the lands conveyed, the title to which was transferred directly to the purchasers. There was nothing, therefore, to which the title of the purchasers could relate, and the act only purports to declare it to be valid at that time. It was, in all respects, a fresh grant, and in no way retrospective in its operation.

But further than this, I am satisfied that the doctrine of relation cannot be applied to a case like the present. A tax, to be valid, must be so at the time it is laid and the land sold. The whole proceeding has relation to that time, and the right to tax must then exist. If the land be not then taxable, subsequent events cannot make it so, or cure the imperfection. The supreme court, speaking of the effect of a conveyance of land for taxes, in the case of *Carroll vs. Safford*, 3 How., 462, cited by the court, say : "It cannot, however, convey a better title to the land sold for taxes, than the owner of such land, to whom it stands charged, possessed at the time the taxes constituted a lien, or when the land was sold." There was no power of taxation, and the respondent had no title when this land was sold. The deed, therefore, can only operate as a cloud upon the title which he has since acquired.

Again, it is said that because lands may be rightfully taxed after entry and before the emanation of the patent, the taxation in this case was proper. Enough has already been said to show that there is no analogy between the cases.

Jan. Term,
1860.

McKay
v.
Supervisors
Outagamie
County.

Where land has been entered, the courts hold, in the cases cited, that it is no longer the property of the United States, but of the purchaser. They say that he has purchased and paid for it, and holds a final certificate, which can no more be cancelled by the United States than a patent; and that in this respect there is no difference between a certificate holder and a patentee. The question therefore is not whether the government may not, technically speaking, have been possessed of the fee, but who was the substantial owner.

I have endeavored to show that the United States had a perfect title to the tract in question, and if I have succeeded, those authorities are inapplicable.

For these reasons, I am of opinion that the judgment of the circuit court should be affirmed.

Judgment reversed.