THE PEOPLE OF THE STATE OF CALIFORNIA, BY
J. G. McCULLOUGH, ATTORNEY-GENERAL *v.* ROBERT
SHEARER, ASSESSOR OF MARIN COUNTY.

LANDS SOLD BY THE UNITED STATES LIABLE TO TAXATION. — When land of the
United States has been paid for, and a certificate of purchase has been given to
the purchaser, it is liable to taxation, although the patent may not have isssued.

PRE–EMPTION LANDS NOT LIABLE TO TAXATION.—Land, as such, in the occupancy
of a pre-emptor, whose right to purchase as such pre-emptor has been determined
in his favor, is not subject to taxation until the pre-emptor has paid for the same.

CONGRESS MAY DESTROY PRE–EMPTION RIGHT. — Land in the occupancy of a pre-
emptioner, and to which a pre-emption right has attached, may be withdrawn from
the operation of the pre-emption laws by Congress at any time before payment
has been made for the same to the United States.

TAXATION OF UNITED STATES LANDS.—The public domain of the United States is
exempt from taxation. What is meant by the term "public domain," as here
used, discussed.

IMPROVEMENTS ON PUBLIC LANDS MAY BE TAXED. — Improvements on the public
lands of the United States, whether owned by a pre-emptioner or one occupying
public lands without license, are liable to assessment and taxation if made so
by the revenue laws of a State.

LIMITATIONS ON POWER OF TAXATION.—Limitations by Congress upon the right of a
State to tax its citizens are to be strictly construed.

TAXATION OF POSSESSORY INTEREST IN PUBLIC LANDS.—The possession by the citi-
zen of, and his possessory interest in the public lands for mining, agricultural, or
other purposes, constitutes a species of property recognized by law, and is subject
to taxation by the State.

CASE AFFIRMED.—*The State* v. *Moore,* 12 Cal. 56, as to power of State to tax the
possessory right to a mining claim, affirmed.

WRIT OF MANDATE TO ASSESSOR.— A writ of mandate will be granted to compel
an Assessor to assess for taxation property liable to be taxed, and which he neg-
lects or refuses to assess.

THIS action was commenced in the Supreme Court.

The other facts are stated in the opinion of the Court.

*J. McM. Shafter* argued the case orally on behalf of the
plaintiff, but no argument was made on behalf of the defend-
ant.  No briefs were filed.

By the Court, SAWYER, J.:

The following facts are alleged in the petition for a man-
date, and they are either expressly admitted, or are not suffi-
ciently denied by the answer to put them in issue.  The case
is substantially submitted on the facts as stated in the petition.

A tract of land containing from twenty to thirty thousand acres, in the County of Marin, known by the name of "Rancho Bolsa de Tomales," was claimed, under a Mexican grant to one Padilla, by James D. Galbraith, in whose name a petition for confirmation was duly presented to the Board of Land Commissioners, under the Act of Congress of 1851. The claim was finally rejected by the Supreme Court of the United States (after a litigation of some ten years) in 1863. At the time of the rejection different portions of the rancho were occupied by various parties, more than one hundred in number, who had each for himself taken possession of the part so occupied by him and set up a claim thereto, holding exclusive and adverse possession. These various portions had been so held and possessed adversely, and improved by the several occupants, for periods of from six to more than ten years. Upon the rejection of the claim under said Mexican grant, the said occupants procured the passage of an Act through Congress entitled "An Act to grant the right of pre-emption to certain settlers on the Rancho Bolsa de Tomales, in the State of California," which was approved June 17th, 1864, (Stat. at Large, 1864, p. 136.) The Act authorizes the surveys to be extended over said "Rancho Bolsa de Tomales," and provides, "that, after the return of such approved plats to the district office, it may and shall be lawful for individuals, settlers upon the said Rancho Bolsa de Tomales to enter, according to the lines of the public surveys, at one dollar and twenty-five cents per acre, the land settled upon by them, to the extent to which the same had been reduced to possession at the time of said adjudication of said Supreme Court." It requires that claims to enter said lands in pursuance of the Act shall be presented to the Register and Receiver of the Land Office of the district, within one year after the return of the surveys, and said officers are to determine the extent to which such lands have been reduced to possession, which determinations are to be final. The amount to be entered by each possessor is limited to three hundred and twenty acres. All claims of right to purchase under the Act not presented within twelve months are

to be barred, but no time is limited for making payment for the lands. The surveys have been extended over the said lands, and the various occupants have presented their claims to the Register and Receiver, which have been adjudicated in their favor. Those adjudged to be entitled to purchase have not taken out their patents, and some of them, it is alleged, and not denied, have expressed an intention of delaying the procurement of patents for the sole reason that they expect thereby to escape taxation. Whether they, or any of them, have paid the purchase money does not appear. The said occupants and claimants refuse to give in or return their claims to the possession or right of possession of said lands to the Assessor for taxation. The respondent, who is the Assessor of the County of Marin, within which said lands are situate, has been notified, and required on behalf of the people, to assess such property interest as the said possessors and claimants have in said lands, or the possession thereof, in such manner as is required by law, which the said respondent refuses to do. The petitioners, therefore, ask that a peremptory mandate be issued commanding said respondent as Assessor of said county " to assess all claims to," or " possessions of," or " rights of possession to," or " ownership of," any and all lands upon said Rancho Bolsa de Tomales, etc., in the manner required by the Revenue Acts of this State.

If the said occupants and claimants have any property interest of any sort in said lands, or in the improvements thereon, or the possession thereof, subject to taxation under the revenue laws of the State, it is clearly the duty of the respondent to make the assessment in the mode required by law, and the people are entitled to the writ. The question to be determined, therefore, is, have said occupants and claimants any property interest subject to taxation ?

### *Taxation of pre-emption claim.*

If any of the occupants and claimants have paid to the proper officer of the United States the purchase money for the lands, which they have been adjudged to be entitled to pur-

chase, in pursuance of the said Act of June 17th, 1864, the
lands so paid for are clearly subject to taxation as lands,
although the patent may not have been issued.   By the pay-
ment and acceptance of the purchase money the claimant has
performed everything to be done by him, and the purchase
has been completed.   The payment, receipt of the purchase
money, and the issuing of a receipt and certificate of entry
therefor, constitute an entry of the land.   The contract of
purchase is executed and the land is his, and no longer belongs
to the Government.   The conveyance has not been made, but
the Government of the United States only holds the legal title
in trust for the purchaser.   The land no longer constitutes a
part of the public domain.   The United States have ceased to
have any proprietary interest in it.   It is henceforth private
property, and as such subject to taxation.   It is not within
the provisions of the Act admitting California into the Union
prohibiting taxation of the public domain.   This is settled by
judicial decision.   (*Gwynne* v. *Niswanger,* 15 O. 368 ; *Astrom*
v. *Hammond,* 3 McLean, 108 ; *Carroll* v. *Perry,* 4 McLean,
26 ; *Ross* v. *Supervisors Ontagamie County,* 12 Wis. 38 ; *Car-
roll'* v. *Safford,* 3 How. U. S. 441.)   If, then, any of the
claimants have paid the purchase money the land itself is
taxable.

But it does not appear that payment has been made.   It
will, therefore, be necessary to discuss questions arising upon
the hypothesis that the right to purchase specific portions of
land possessed by the occupants has been determined in their
favor, but that they have thus far neglected to pay the pur-
chase money.   Have the occupants acquired any proprietary
interest—any title, legal or equitable, to the land by virtue
of the Act of Congress and the proceedings under it, which
can be subjected to taxation ?   We think not.   There is no
contract now existing between the United States and the
occupants in respect to those lands.   There is no proprietary
interest in the lands vested in the occupants by virtue of the
statute, and the acts thus far performed under it.   If there
were, it could not be divested by a repeal of the Act of Con-

gress.  But there is none.  There is simply an offer on the part of the United States Government to sell the land to the possessors at the date of the rejection of the claim under the Mexican grant, upon their paying the money; and, under the law, as it now stands, the land is not subject to entry by any other party.  The preference is given to the occupant whenever he chooses to comply with all the terms; and the terms yet to be complied with are the payment of the money.  There is no promise on the part of the United States to sell upon a promise on the part of the occupants to pay, or to purchase, and no promise to keep the offer open an indefinite period of time, till it suits the convenience or caprice of the occupants to pay the price.  One promise is not a consideration for another.  But the Government says you may purchase the land by paying the money.  There is no obligation on the part of the occupants, notwithstanding they have proved up their claim, to take the land.  They may abandon it to-morrow, and refuse forever to pay the price.  There is no obligation to take it, and the Government has no claim or demand, covenant or promise, which it can enforce against the occupants, who now have the right to purchase under the Act.  Yet the occupants are dealing with the Government in the character of a proprietor of land offering to sell upon the terms of payment alone.  There is simply an offer made on one side, with a manifestation on the other side of a desire and intention to accept it at some future time; but as yet no actual acceptance or performance of the conditions necessary to constitute an acceptance.  There is an offer to sell unrevoked, and a present right to accept, but no proprietary interest vested in the land.  Congress could at any time repeal the Act, and thereby revoke the offer; and this is liable at any time to be done, if the settlers do not within a reasonable time perfect their inchoate rights by paying the purchase money.

The Supreme Court of Mississippi says upon this point: "The most important provision of the law still remained to

be complied with—the land was to be paid for. The determination of the Commissioners settled nothing, but that Matlock's representatives had a right to buy a particular tract of land if they wished to do so. A mere right of pre-emption is not a title. It is only a proffer to a certain class of persons that they may become purchasers if they will. Without payment, or an offer to pay, it confers no equity. It is only regarded as conferring an equity when the party has consented to accept the offer by payment, or by claiming the benefit of the law in the proper manner, within the required time." (*Grand Gulf R. & B. Co.* v. *Bryan,* 8 Sm. and M. 268. See, also, *Phelps* v. *Kellogg,* 15 Ill. 135 ; *Bower* v. *Higbee,* 9 Mo. 261.)

*Withdrawal of land from pre-emption right.*

In the cases of *Hastings* v. *McGoogin,* 27 Cal. 85, and *Page* v. *Hobbs,* Ib. 483, we held that the Act of Congress of March 3d, 1863, authorizing certain purchasers under Vallejo to enter the lands embraced in the Suscol Rancho, within one year after the filing of the surveys and plats, withdrew said lands from the operation of the general pre-emption laws, and conferred the right to purchase upon a particular class of persons other than those who had already entered, and set up claims under the general laws, thereby necessarily assuming that it was competent for Congress to thus withdraw them. The question was, in fact, made in those cases, that Congress had no power to withdraw from the operation of the general pre-emption laws those lands as to which parties had taken the preliminary steps in pursuance of the provisions of such general law to acquire a pre-emption right. But the Court were clearly of opinion that no property right had yet vested —that there was no contract existing between the claimant and Government, and that it was competent for Congress to repeal the law granting pre-emption rights, or to withdraw any particular lands from the operation of its provisions, and no time was spent in discussing the question. To hold otherwise would be to hold that there might be a contract without

consideration, and without being mutually obligatory on the parties. Since those decisions were rendered the Attorney-General of the United States, in a carefully prepared opinion, written at the request of the Secretary of the Interior for the guidance of his department, upon this precise point has expressed similar views. He says: "According to the view I take of the case of the 'Suscol Rancho,' stated in your letter of the twenty-first instant, it is entirely unimportant to determine at what time that tract became open to settlement under the general pre-emption laws, since, in my opinion, Congress had full power to dispose of the lands claimed by settlers under the pre-emption laws at any time before the proof and payment required by those laws were made. The purpose and effect of the Act of March 3d, 1863, were to remove from entry at the Land Office by persons claiming to be settlers under the pre-emption laws all the lands within the limits of the 'Suscol Rancho' in California until the expiration of twelve months after the return of the public surveys authorized by the statute to be extended over the tract of country embraced by that rancho. * * * It is not to be doubted that settlement on the public lands of the United States, no matter how long continued, confers no right against the Government. It only gives the settler under the pre-emption laws a right to enter the land occupied and improved when it is open to sale, and when he has complied with the condition as to proof of settlement and improvement and payment of the consideration prescribed by the statute. It is compliance with these conditions that alone vests an interest in the land. The land continues subject to the absolute disposing power of Congress until the settler has made the required proofs of settlement and improvement and has paid the requisite purchase money. Before those steps are taken for the designation and assertion of his claim, Congress may at any time intervene, and either except the land from entry, location or appropriation, or dispose of it by grant to other parties. Before proof and payment are made the only right which a settler has is an inchoate right of entry. When proof

and payment are duly made his right of entry becomes choate, and he acquires (perhaps even before entry) a vested interest in the land. The question may be a delicate one, whether Congress can impair a vested right of entry ; but there is no doubt that before the settler has taken the steps necessary to convert the privilege of pre-emption into a vested right of entry, by establishing the fact of his settlement and paying the purchase in the manner prescribed by law, Congress has absolute power to place the land beyond the operation of the statutes under which the settlement was made.   *   *   *   I have already said that a settler, under the pre-emption laws, acquires and can acquire no vested interest in the land he occupies by virtue simply of settlement; and that no vested intesest is obtained until after the settler has taken all the legal steps necessary to perfect an entry in the Land Office. Before such steps are taken he has nothing but a contingent personal privilege to become, without competition, the first purchaser of the property, which he may never exercise or which he may waive or abandon. During the interval between the institution of the settlement and the establishment of the claim by proof and payment of the consideration nominated in the law, Congress has power to dispose of the land at its pleasure. It may recall the privilege previously conferred or invest any one else with the same privilege, or it may make an absolute grant of the land to other parties, with or without consideration. There is no constitutional objection to the exercise by Congress of any power over the land after settlement made, but before right of entry has been perfected, that it was competent to exercise before the land was thrown open to pre-emption." (Opinion of Attorney-General Speed, May 26th, 1866.)

Similar views have been expressed by some of his predecessors. Although the opinions of the Attorneys-General are not of controlling authority, yet, in view of their relation to the General Government and the nature of their duties, they are regarded as having a *quasi* judicial character and entitled to great respect. But independent of these considerations,

we believe the conclusions of the Attorney-General to be based on solid ground. We know of no judicial decision, either in the State or Federal Courts, holding or intimating a contrary view. *Lytle* v. *State of Arkansas*, 9 How. 333, has been sometimes cited as the case supposed most strongly to indicate a different view; but there is nothing in it to support the position. Mr. Justice McLean, it is true, remarks that "the claim of a pre-emption is not that shadowy right which by some it is considered to be." But this was said with reference to the facts of that case, and, he immediately adds, "until sanctioned by law it has no existence as a substantive right. But when covered by law, it becomes a legal right, subject to be defeated only by a failure to perform the conditions annexed to it." (Page 333.) In that case the pre-emption claim was "covered by the law," at the time when another party located upon it, and the settler claiming a pre-emption had a right then subsisting. The Act of May 29th, 1830, gave a pre-emption right "to every occupant of the public land prior to the date of the Act, and who had cultivated any part thereof in the year 1829." (Page 315.) On the 15th of June, 1832, "Congress passed an Act granting one thousand acres of land to the Territory of Arkansas, contiguous to and adjoining the Town of Little Rock, for the erection of a Court House and Jail at Little Rock." (318.) Subsequently on the 14th of July, 1832, Congress passed another Act, giving to persons who were entitled to a pre-emption under the Act of 1830, but who had not been able to enter the same within the time limited, because the township plats had not been made and returned, one year from the return of the plats within which to enter said lands upon the same terms and conditions as were prescribed by the Act of 1830. Cloyes was one of the parties embraced within the terms of the Acts of 1830, and July 14th, 1832. He had taken all the steps he could take to secure his pre-emption rights to the land in question before the location of the lands for a Court House by the Governor under the Act of June 15th, 1832, but the Governor, disregarding his pre-emption right, located a part

of the grant to the State of Arkansas on the land claimed by Cloyes. Now in this case there was no repeal of the Act of 1830, which was continued in force by the Act of July 14th, 1832, and the land upon which Cloyes' pre-emption right had attached was not withdrawn or attempted to be withdrawn from the operation of those Acts. On the contrary they were in full force and covered and protected the pre-emption right, and the right was still subsisting when the Governor located upon it. The Act of June 15th, 1832, did not purport to grant to the State of Arkansas the specific land claimed by Cloyes, or authorize a location upon that specific tract of land. It simply granted one thousand acres to be located " contiguous to and adjoining the Town of Little Rock." But the location was left open to be made by the Governor on any land subject to be located, and of course upon such lands as had not already been appropriated under other Acts still in force and no other. There is no inconsistency between the Acts, and the Court held that the Act should not be so construed as to authorize a location which would interfere with the pre-emption of Cloyes. All the Acts were so construed that they could stand together, and each have effect. It is simply the case of two parties entitled to make a location at the same time, and the party who first locates and follows up his claim in the mode prescribed acquires the right to enter the specific tract of land as against the party who makes a subsequent selection of the same land. This is all there is of the case. There is not the remotest intimation that any proprietary interest in the land, which could not be affected by subsequent legislation, vested in Cloyes before payment of the purchase money.

From these considerations it is clear to our minds, that no proprietary interest in the lands within the Rancho Bolsa de Tomales vested in the several occupants as against the United States by virtue of the Act of June 17th, 1864, and the proceedings under it. It follows that no property which can be subjected to taxation was thereby acquired by such occupants.

No taxable interest was acquired under the Act *which they did not before possess.*

### *Public domain of the United States exempt from taxation.*

The land itself is clearly not taxable, for that belongs to the United States.   The United States is the sole proprietor, holding the entire proprietary interest whether legal or equitable.   It is a part of the public domain of the United States, and as such exempt from taxation under the compact contained in the Act of Congress of September 9th, 1850, admitting California into the Union.   (*Hall* v. *Dowling,* 18 Cal. 621; *People* v. *Morrison,* 22 Cal. 77.)

### *Improvements on public lands liable to be assessed for taxation.*

But the occupants have erected improvements upon the land, and have been in the exclusive, adverse possession and enjoyment of both the land and improvements, for a period of from six to more than ten years; and they are still in the possession and enjoyment of said land and improvements, and exercising acts of dominion over them.   Does this relation to the land disclose any interest subject to taxation?   The possession itself of the public lands and the improvements thereon, whether by naked trespassers, or those who claim in addition a right of pre-emption, as to everybody except the United States, have always in California, and in most, if not all of the new States, been regarded as valuable property interests. The transfers of such possession and improvements have always been held to constitute a valuable consideration for a promise. The possessors often derive and enjoy large revenues from them.   Contracts for such possession, and rights growing out of them are constantly recognized, protected and enforced by the Courts, and, in this State, a very large share of the litigation in the Courts maintained by means arising from taxation grows out of this very class of rights.   The possession and interest of the possessors, whatever they may be, are constantly sold under execution, and under judgments foreclosing mortgages, and other liens, and the purchasers are put in pos-

session, and protected in the enjoyment of the rights thus acquired. Such possession of the public lands, and the improvements put upon them, are, therefore, recognized and protected as a valuable species of property in the possessor. The Legislatures of this and other States have also in various statutes recognized these possessions as a species of property. In *Turney* v. *Saunders*, 4 Scam. 531, the Court say : " In determining whether this demurrer was well taken, it is proper that we should first inquire whether a person in possession of and entitled to a pre-emption to a tract of public land, has such an estate in the premises as to secure a lien to a mechanic, for erecting buildings thereon, under a contract with the person thus in possession. We are clearly of opinion that he has. The Legislature has wisely seen fit to pass a variety of Acts recognizing and affecting the interests in these possessions of the occupants of the public lands. The General Government still retains the title to a large proportion of the land in many of our populous and wealthy counties; on which are permanent improvements of great intrinsic value, and hence the necessity of passing laws adapted to property thus peculiarly situated. To allow a class of persons to hold and enjoy large fortunes beyond the reach of their creditors was too shocking to a sense of justice to allow it to pass unnoticed by the Legislature, and consequently it has, by repeated Acts, treated these improvements as the proper subjects of transfer and ownership. They are made sufficient consideration for contracts and promises. Lands thus owned and occupied are treated as proper subjects for actions of trespass, forcible entry and detainer, forcible detainer and ejectment ; and, indeed, they are throughout treated as the property of the individuals possessing them, and as such they are subject to the control and disposition of the law, so far as the occupant is concerned, as much as if he owned the fee—except, however, that no disposition can be made of them so as to affect in any way a title which may be derived from the United States. In cases of ejectment for these claims it is only necessary for the plaintiff to deduce a regular title from the first occupant (unless

his claim has been abandoned,) who is considered as the fountain of his title, which will prevail, unless opposed by a Government title, when it vanishes. Upon such titles depend the security of extensive plantations, and some of the largest manufactories, mills and machinery in the State. Such is the situation of many populous villages and flourishing towns."

These observations are equally applicable to the condition of things in this State. (See also *Delannay* v. *Burnett*, 4 Gilm. 492; *Pierson* v. *David*, 1 Clarke, Iowa, 25; *Bush* v. *Marshall*, 6 How. U. S. 291; *Thredgill* v. *Pintard*, 12 How. 36.) These possessions, then, are recognized as a species of property subsisting in the hands of the citizen. It is not the land itself, nor the title to the land, nor is it the identical estate held by the United States. It is not the pre-emption right, but is the possession and valuable use of the land subsisting in the citizen. Why should it not contribute its proper share, according to the value of the interest, whatever it may be, of the taxes necessary to sustain the Government which recognizes and protects it?

### *Possessory right to a mining claim liable to taxation.*

In the *State* v. *Moore*, 12 Cal. 56, it is held that the possessory right in a mining claim is subject to taxation, and that such possession is not within the provision of the Act admitting California into the Union, which provides that the State of California " shall never lay any tax or assessment of any description whatever upon the public domain of the United States." If that case was correctly decided it must govern this, for there can be no distinction taken between the possession of a mining claim upon the public lands, and the possession of a claim for agricultural purposes. The mining land and agricultural lands equally belong to the United States, and constitute a part of the public domain. In the subsequent cases of *Hall* v. *Dowling*, 18 Cal. 620, and *People* v. *Morrison*, 22 Cal. 80, this question did not arise, and although the question was alluded to in the latter case, it was expressly stated

83

by one of the Justices that the Court did not intend to pass upon it. There are, nevertheless, expressions in the opinions, which seem to be inconsistent with the point decided in the *State* v. *Moore.* Notwithstanding these intimations to the contrary, after a careful examination, we feel constrained to concur in the point decided in the latter case. Domain, as defined by Burrill, is "the ownership of land; immediate or absolute ownership; paramount or ultimate ownership; an estate or patrimony which one has in his own right; land of which one is absolute owner; the public lands of a State are frequently termed the public domain, or domain of the State." (Burr. Law. Dic., Title Domain.) These definitions are sufficiently accurate and comprehensive for the present purpose. If we take "ownership of land," as the proper definition, then, the "public domain," which is not to be taxed, is the public ownership of the lands—that is to say, the ownership of, or property in the lands existing in the United States. But it is not proposed to tax that. If we take "an estate or patrimony which one has in his own right" as the definition, the "public domain" not to be taxed would be, the estate or patrimony which the United States have in their own right, and we come to the same thing. This is not what it is proposed to tax. Or, if we take land of which one is absolute owner as the definition, the public domain of the United States is the land of which the United States is owner, and this is not what it is proposed to tax. The relation of the United States to the public lands since the admission of California into the Union is simply proprietary—that of an owner of the lands like any citizen who owns lands, and not that of municipal sovereignty. (*State of Minnesota* v. *Bachelder,* 5 Minn. 234 ; *Camp* v. *Smith,* 2 Minn. 155 ; *Stockdale* v. *Treasurer of Webster County,* 12 Iowa, 538.)

*Limitations upon the right of a State to tax property to be strictly construed.*

Had it not been for the stipulation to the contrary in the Act of admission, the United States might have been required

to pay taxes on the land owned by it, situate within the limits
of California, like any other proprietor of lands ; and it
appears to us manifest that it was to guard against any such
possible claim on the part of the State of California that the
provision was inserted in the Act of admission.   The General
Government sought to protect its own property, its own inter-
ests, and not that of the citizens of California.   Congress could
never have intended by the introduction of the provision under
consideration to interfere with the sovereign power of the
State of California over its citizens, or over the property of its
citizens.   This provision can have full effect by confining its
operation to an exemption of the property interest of the
General Government itself, and it cannot be construed to limit
the exercise of a sovereign power of the State over a citizen,
or any property of a citizen, unless the intention to so limit it
is clearly expressed.   Such limitations upon the sovereign
powers of a State must be strictly construed.   They are not
to be extended by doubtful implications beyond the manifest
import of the language.

These possessions subsist in the citizen and often yield large
revenues, especially in this State.   In fact, in a very consider-
able portion of the State a large, if not the larger, part of the
incomes of the citizens are derived from these sources.   They
exist wholly independent of pre-emption laws, without any
pre-emption right or intention to claim such right, and always
anterior to the existence of those rights.   The pre-emption
right is not the possession, although it may be, and when it
exists at all, is based upon a possession.   These possessions,
as before stated, are recognized and protected as property by
the Legislature in many instances, and by the Courts and the
people always.   And this property is property in the citizen
or inhabitant having possession, and not in the United States.
This property, so recognized and protected, in our judgment
is clearly not exempt from taxation under the clause in the
Act of Congress of September 9th, 1850, exempting the pub-
lic domain of the United States from taxation.   The public
domain of the United States and this species of property of

the citizen in the possession of the public lands are in no respect identical. It is only the property interest of the citizen that can be taxed or affected by a tax sale. The title of the Government, the land. itself, cannot be affected, nor will any title that may hereafter be derived from the Government be affected.

It is claimed that the property in question in this proceeding is within the exception of the fourth section of the Revenue Act of ·1861, as amended by the Act of April 2d, 1866, and is, therefore, exempt from taxation under the Act. The fourth section, as thus amended, provides that the following property shall be exempt from taxation :

"First—All property, real or personal, exempt from taxation by the Constitution of the United States or the Act of September 9, 1850, admitting this State into the Union, or any law of Congress passed in pursuance of said Constitution.

"Second—All lands and all property, real or personal, belonging to the United States or this State." (Laws 1866, p. 803, Sec. 4.)

But these provisions are no broader than the provisions of the Act of Congress already discussed, and are only intended to give effect to those provisions and protect the property interest of the United States from taxation.

Are the interests of these occupants embraced within the other provisions of the Revenue Act? Section four provides that "all property, both real and personal, of every kind, nature and description whatever, within this State, whether owned by individuals or by corporations, and whether its owner be a resident or non-resident of this State, shall be liable to taxation, subject to the exemptions hereinafter specified." (Laws 1866, p. 803, Sec. 4.)

Section five provides, that "the term real estate, whenever used in this Act, shall be deemed and taken to mean and include the ownership of, or claim to, or possession of, or right of possession to, any land within the State ; and the claim by, or possession of any person, firm, corporation, association, or

company, to any land, shall be listed under the head of real estate.   The term personal estate, whenever used in this Act, shall be deemed and taken to mean, and it is hereby declared to mean and include   *   *   *   all houses, buildings, fences, ditches, structures, erections, or other improvements, built or erected upon any land, whether such land be private property or the property of the State, or of the United States."   (Laws 1861, p. 421, Sec. 5.)

*How improvements on public lands should be assessed.*

Thus, we see, that all property of every kind, nature and description, both real and personal, with certain specified exceptions, is to be taxed.   We have before seen that the possessions and claims of occupants of the public lands is a species of property, having a real substantial and saleable value, and many of them a very great value; and this Act further expressly declares the possession of land to be property for the purposes of taxation, and that the claim by, or possession of any person, etc., shall be listed under the head of real estate.   It should doubtless be listed as "the possession, interest and claim of A. B. of, in and to the tract of land described as follows," etc., giving the appropriate description of the land.   And the value of the possessory right should be set down and not the value of the land itself.   But the value should be estimated upon the same principles as the value of other property is estimated.   We think the possessory interests of the settlers on the lands in question clearly embraced within the terms of the Revenue Act, and not included in the exceptions, and that it was the duty of the Assessor of Marin County to enter them upon his lists.

A peremptory mandate is therefore awarded in pursuance of the prayer of the petitioner.

Mr. Justice SHAFTER, being interested in the question, did not participate in the decision.