## LUTHER LAPHAM V. A. R. HEAD.

CONTRACT, *Not Void for Want of Consideration, or as being Against Public Policy.* E. was in the rightful possession of a certain piece of government land. He rented a portion thereof to L. and J. Afterward, L. purchased from E. all of E.'s improvements on the land, intending them for his brother, paying therefor $1,000. E. then delivered to L. and J. the entire possession of the land, and they moved upon it, and resided thereon. L.'s brother, however, not desiring the land or the improvements thereon, L., with the consent of J., filed a declaratory statement for the preëmption of the land in the name of J. Afterward, L., with the consent of J., and by agreement with H., relinquished to H. their said possession, and improvements and crops, and relinquished said filing for preëmption, and H., in consideration therefor, executed to L. his three promissory notes, each for $225, and delivered to L. a team valued at $375. *Held,* That the contract between L. and H. is not void, either for want of consideration or as being against public policy, and that L. may recover against H. on said promissory notes; and this, notwithstanding the fact that said filing, as between L. and J. on one side and the government of the United States on the other, may be void.

### *Error from Saline District Court.*

ACTION, brought by *Lapham* against *Head,* upon a promissory note for $225, given by *Head* to *Lapham.* At the April Term, 1877, of the district court, *Head,* defendant, had judgment against *Lapham,* plaintiff, who brings the case here on error. The opinion contains a full statement of the facts.

*Garver & Lovitt,* for plaintiff in error.

*J. G. Mohler,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This was an action upon a promissory note given by the defendant, A. R. Head, to the plaintiff, Luther Lapham, for $225. The note was executed under the following circumstances: In 1873, one A. D. Edwards held a quarter-section of government land near the plaintiff's residence, and Edwards desiring to go east on account of his wife, and Lapham desiring the claim for a brother then on a

visit to Texas, a sale of the improvements on the land was made by Edwards to Lapham in consideration of $1,000, for which Lapham gave his notes. At this time, Lapham and his brother-in-law, John Layner, had the cultivated ground on said land rented from Edwards, and Layner resided thereon with Edwards. On his return, Lapham's brother concluded not to take a claim, and went back east. Lapham then made arrangements with Layner, and a filing in the local United States land office was made for the land, July 3d, 1873, in the name of John Layner. At this time both Layner and Lapham were residing upon the land. July 6th, 1873, the defendant Head came into the neighborhood of this land, heard of it, and concluded a bargain with Lapham, whereby he agreed to pay Lapham $1,050, and Lapham agreed to relinquish the filing he held on the land, and to surrender the possession, improvements and crops to Head. On July 7th, 1873, Lapham and Head went to the United States land office in Salina, where the Layner filing was relinquished — a team, and the note in suit, and three other notes, delivered to the plaintiff — and within a few days thereafter, Lapham and Layner vacated the land, leaving Head in full and undisputed possession, with all the crops and improvements. At the time of the trial of this case in the court below, Head was still in the undisputed enjoyment of the premises. On the trial, the defendant claimed a want of consideration for the note and part payment. The court found payment to the amount of $220.70, made February 10, 1874; that Lapham did not have a valid filing on the land when the note in suit was executed; and concluded as a matter of law, that the note was given in pursuance of an agreement which was contrary to public policy, and that no recovery could be had upon it.

The case was tried by the court without a jury. The court made special findings of fact and conclusions of law, and upon these findings and conclusions rendered judgment in favor of the defendant and against the plaintiff for costs.

We think the court below erred both as to the facts and the law of the case.

The defendant claims, and he so testified on the trial, that up to the time of making said notes he did not know that Lapham's name was Lapham, but supposed that it was John Layner, and that at the time of making said notes he learned for the first time that Lapham was Lapham and not Layner. He also claims and testified that he thought while he was dealing with Lapham he was dealing with the man in whose name the said filing of said declaratory statement for said land was made, and that the filing was valid, and gave to the person in whose name it was made a valid right to the land. He also now claims, though there was no evidence to support such claim, that he delivered said team (consisting of a pair of mules and harness and a wagon) to Lapham *before said notes were executed,* and before he knew that Lapham was not Layner. He also now seems to claim that Lapham sold him the *land,* and not merely that Lapham agreed to relinquish to him all his and Layner's claim to the possession of the land, and all their right to purchase the same from the government, and all their improvements and crops thereon; and he also seems to make several other claims not sustained by the evidence, which we shall not specifically mention.

The following evidence, we think, will show that he did know who Lapham was before he had any dealings with him; that he did know from the commencement of their dealings in whose name the filing was made; that he did not deliver any property or anything else of value in payment for the claim until after he had drawn up and signed said notes in which *Lapham* was the payee, and that he knew he was not purchasing the *land* (but only improvements, etc.) from Lapham.

Mr. A. W. Segar testified on the trial, as follows:

"Am acquainted with the parties. First saw Head about July 6, 1873, where he was camped on the creek below me, and near this land. He was looking for a place, and I told

him that *Lapham* had a claim for sale; that he had two, and had to sell one. Afterward, I took Lapham down *and introduced him to Head as Mr. Lapham* who had the claim. I think Head knew that his name was Lapham. I told Head the place was mixed a little; *that Lapham could not hold it.* I knew that Lapham had bought the place for one of his brothers. I knew when I spoke to Head that Layner had a filing on the land, and claimed it. *I think I told Head that Layner had a filing on it.*"

Mr. Charles Hunt testified as follows:

"Am acquainted with Lapham and Head. Came with Head to this country. Was at Lapham's place with Head, July 6th, 1873. Mr. A. W. Segar was at our camp before we saw Lapham, and he told Head that Lapham had a claim to sell. I did not go with Head to look at the place at first. He came to me and got me to go down to it. I think Head knew when he made the contract with Lapham that his name was Lapham. It was understood, and I think Head knew, that the filing was in Layner's name. I think so from what he said."

The defendant, Head, himself testified as follows:

"*Mr. Segar introduced me to Lapham.* I was camped on the creek in that neighborhood, and Mr. Segar came where we were and told me of this place of Lapham. I was then looking for a place. I wanted to get a place partly improved if I could. Mr. Segar told me Lapham had a place for sale. I went with Lapham to look at the place, and we walked over it. I made an examination of it, so that I might know what it was. Everything looked very well, and the place was in good condition," etc.

The plaintiff Lapham testified as follows:

"Got acquainted with the defendant in July, 1873, near where I was living. Mr. A. W. Segar introduced me to him; *mentioned my name;* and Head knew at that time that my name was Lapham."

Lapham and Layner were brothers-in-law, and were at this time living on the land in the same house. Layner testified by deposition as follows:

"The defendant A. R. Head came to the place where Lapham and this deponent resided, about the month of July, 1873, in said Saline county, Kansas, and purchased from the

plaintiff Lapham the said premises; that this deponent told said defendant Head that the land *was filed on in this deponent's name*, and never told him that it was not filed on in my name; that the land was relinquished to the defendant Head with my knowledge and consent; that deponent moved from the premises and gave possession thereof to the defendant Head, so that the said plaintiff might realize the purchase money paid Edwards for the improvements on the laud; that he would not have thus surrendered possession if the said defendant had not purchased the said premises from plaintiff."

The defendant looked at said land on July 6, 1873. On the next day, he and the plaintiff went to the United States land office at Salina, where the plaintiff relinquished Layner's claim to the premises as aforesaid. The defendant Head testified with reference thereto as follows:

"July 7, 1873, we went to the land office, and he (Lapham) made this relinquishment in Layner's name on the back of the filing paper. I saw Lapham sign the name of John Layner to the relinquishment. Layner was not with us in town at that time. The filing paper of Layner, with the relinquishment, was then given to me by Lapham, and I have had it ever since. When the relinquishment was made, I knew that the filing was in the name of Layner. I found it out by seeing the relinquishment made out and signed."

Said "filing paper" also showed that the filing was made in the name of Layner.

The defendant further testified:

"This was done July 7, 1873. He signed the name 'John Layner' to the relinquishment. I did not know then but that he was Layner; did not know his name was Lapham. We *then* went to a store in Salina, and I wrote out a note and handed it to him. I drew the note payable to John Layner. He said then that his name was not Layner but Lapham, and he wanted the notes drawn payable to him. I tore that note up, and wrote new notes payable to *Luther Lapham*, signed them, and delivered them to him. After we had been to the land office, and after the relinquishment was made, *and before we left town*, I turned the team over to Lapham. . . . *We came* to Salina that day with the team that I traded to Lapham. I drove it to town, and he drove it home. I turned it over to him after the relinquishment was

made. *I don't remember whether the team was turned over before or after the notes were drawn.*"

The plaintiff testified on this subject as follows:

"Head knew that the filing was in the name of Layner before he delivered either the team or notes. *Team was not delivered until after the notes.* Head drove team to town, and *as we went to start home he turned it over to me, and I drove home.*"

We think the court below erred in finding that the team was turned over to Lapham before the notes were executed, as there was no evidence to support this finding.

With respect to what the defendant supposed he was purchasing from the plaintiff, he testified as follows:

"I purchased the possession and improvements of a piece of land from the plaintiff. What I wanted was the possession and improvements of that piece of land. I got that. I did not expect to get title to the land from Lapham, but from the government. When I made the bargain with Lapham, I agreed to give him $1,050 for the possession and improvements and the land, and the relinquishment of a valid filing on the land by Lapham, which I supposed he had, and which was a part of the consideration I paid. I intended to file on the land and get my title and patent from the government, but I also expected that Lapham would relinquish a valid filing to the land."

With respect to some bonds which the defendant pledged as security for said notes, he testified as follows:

"I deposited with Mr. A. W. Segar some Brown county (Ohio) bonds, as collateral security for the four notes I gave Lapham. The next day, or several days after, we were in Salina; I delivered the bonds to Segar."

The plaintiff testified that "in a day or two after they returned from Salina, some Brown county (Ohio) turnpike bonds were deposited with A. W. Segar as security for the notes." Whether the defendant deposited these bonds with Segar before or after he got possession of said land, is not shown.

Afterward the defendant made two or three different payments on said notes—one of $3, one of $39.50, and possibly one of $220.75. As to the last item of payment the pre-

22—21 KAS.

ponderance of the evidence shows that it was not a payment, except upon a condition precedent which has never been fulfilled. If, however, it should be considered as a payment absolute, then it should be, according to the preponderance of the evidence, set aside for fraud. It was made merely by delivering to the plaintiff some of said Brown county (Ohio) turnpike bonds, which had previously been deposited with Segar as collateral security for said notes. · Said bonds were in fact, though the plaintiff did not know it, worth but little, if anything; and the plaintiff received them only upon the assurance from the defendant that they were good, and that they would be paid when presented on that or the next month. The court allowed the defendant to prove that this supposed payment was an absolute payment, by allowing the defendant to testify among other things as to what *his* "*understanding*" was upon the subject. The plaintiff objected to the introduction of this evidence, for various reasons, and also moved to strike it out, but the court overruled his objections, and said motion was overruled, and the plaintiff duly excepted. We think the court erred in this. But the most serious error committed by the court below — the one which goes to the very foundation of the plaintiff's right to recover — was in holding that the contract between the plaintiff and defendant was void, at least partially if not totally, as being against public policy. We do not think the contract was or is void in any respect. Gen. Stat. 184, § 9; *Moore v. McIntosh,* 6 Kas. 39; *Bell v. Parks,* 18 Kas. 152; *Fessler v. Haas,* 19 Kas. 216; *Wilson v. Webster,* Morris (Iowa), 312; *Stannard v. McCarty,* Morris, 125; *Hill v. Smith,* Morris, 70; *Freeman v. Holliday,* Morris, 80; *Ellis v. Mosier,* 2 G. Greene, 246; *Pierson v. David,* 1 Iowa, 23; *Spry v. Sleppy,* 15 Iowa, 409; *Clark v. Shultz,* 4 Mo. 235; *Stubblefield v. Branson,* 20 Mo. 301; *Welch v. Bryan,* 28 Mo. 30; *People v. Shearer,* 30 Cal. 645.

The defendant received all he bargained for. He did not expect to get any title to the land from Lapham. He did not purchase Lapham's filing or Layner's filing. He did not

suppose that any previous filing by Lapham or Layner or by any other person would be of any benefit to him. All that he contracted for was the possession of the land with the improvements and the crops thereon, and he got all these. It is not against the public policy of this state, as is shown and declared by our own public statutes, (Gen. Stat., p.184, § 9,) for persons in good faith to enter into a contract for the purchase and sale of improvements made on the public lands of the United States. And whether the purchaser in such a case gets any legal consideration for his agreement or promise or not, he nevertheless cannot under such statutes be allowed to set up a want of consideration to avoid performing what he has voluntarily agreed to perform. Even if the legislature has no power to authorize a sale of improvements on the public lands, still it has the power to say that the purchaser of such improvements shall not be relieved from the performance of his contract made in consideration of such improvements, merely because of a supposed want of consideration for his contract. It is even competent for the legislature to render *illegality of consideration,* as well as a want of consideration, no defense to an action on a contract. But in this case there was nothing illegal, so far as this contract is concerned. The land was subject to settlement and sale. Edwards had the rightful possession thereof. He rented a portion thereof to Lapham and Layner. They took the rightful possession under Edwards of this portion of the land, and put in their crops. Lapham then bought Edwards's improvements, paying or agreeing to pay $1,000 therefor. Edwards then gave to Lapham and Layner the full possession of the entire premises. They then filed their declaratory statement for preëmption in the name of Layner. Perhaps as against the government of the United States, and at the instance of the government, this filing would not be held to be valid; but so long as the government treats it as valid, all others having no prior right to the land must also treat it as valid. (*Houck v. Kelsey,* 17 Kas. 333.) At the time that said contract was made between the plaintiff and

defendant, the defendant had no right to treat said filing of Lapham and Layner as void. Neither party in the present case contracted to do anything illegal. The plaintiff agreed to give or rather to relinquish to the defendant the possession of said land, with the improvements and the crops thereon, and to relinquish said filing. He did not agree to sell to the defendant said filing, for everybody must know that that could not be done, whether the filing was valid or void. Now it is not claimed that the agreement to give the defendant the possession of said land, improvements and crops was illegal; and how it can be claimed that it was illegal to agree to relinquish said filing for preëmption, we cannot understand. Suppose that the filing was void: would there even then be any illegality in relinquishing it, or in agreeing to relinquish it? And whether valid or void, the defendant did not purchase the filing, and could not under any circumstances have gotten any benefit from it. The defendant does not claim that anything that he agreed to do was illegal. The claim of the defendant that he did not know who Lapham was, or in whose name the filing was made, amounts to nothing, for before the contract was finally consummated he did know beyond all doubt all of these things. He in fact knew every material circumstance necessary to be known in order to make a valid and binding contract; and he knew all of these things before he delivered to Lapham said notes, or said team, or anything else of value. He knew them all before he made the contract, or at least before he completed the contract; and then completed the contract with his eyes open. He has no room to plead ignorance of facts, and his alleged ignorance of law will not excuse him. The plaintiff relinquished to him a filing and a possession with improvements and crops, which the government was allowing him, the plaintiff, to enjoy, and which might have been of great value to the plaintiff, and this relinquishment was a sufficient consideration for the defendant's contract.

The court below also erred in overruling the plaintiff's motion for a new trial. The judgment of the court below

will therefore be reversed, and cause remanded for a new trial.

All the Justices concurring.