[Civil No. 163. Filed June 4, 1886.]

. [S. C. 11 Pac. 122.]

JAMES B. WALLER, Plaintiff and Respondent, v. THOMAS HUGHES, Ex-officio Tax Collector, Defendant and Appellant.

1. TAXATION—CHAPT. 33, COMP. LAWS 1877—§§ 4, 5, 18, CITED— NET PROCEEDS OF MINES par. 2062 to 2073, Comp. Laws 1877, cited— REPEALED BY ACT NO. 40 AND ACT NO. 77, LAWS OF 1881—CHAPT. 33, COMP. LAWS OF 1877 REPEALED CHAPT. 33, HOWELL'S CODE, COMP. LAWS 1864, p. 312—EXEMPTIONS.—No property within the territory is exempt from the operation of these revenue laws, unless put beyond them designedly and unequivocally by the legislature or other sovereign power.

2. SAME—MINES TAXABLE AS REAL ESTATE—"REAL ESTATE" AS USED

IN REVENUE ACT INCLUDES "MINES"—"MINES" INCLUDES PATENTED CLAIMS AND CLAIMS WHERE THE PURCHASE MONEY HAS BEEN PAID AND THE PATENT IS NOT YET ISSUED BY THE GOVERNMENT—"MINING CLAIMS" OR "MINING INTERESTS" REGARDED AS PERSONALTY AND TAXABLE UNDER THE REVENUE ACT.— "Mines," to which patents have been issued, are clearly within the definition of the word "lands," and also "real estate," as used in this act, which terms are defined in chapt. 1, Compiled Laws 1877, and are subject to taxation as real estate. So also mining claims where the occupants have paid to the proper officer of the United States the purchase money therefor, although patent may not have issued; in such cases, by the payment of the money and the acceptance of it by the government, the land is his, the government holding the legal title in trust. "Mining claims" or "mining interests" as used in the revenue act includes that large class of cases where the occupants of mining property do not claim any ownership whatever in the lands in their possession. They simply enter upon the public lands and make improvements thereon, which, while the possession is tolerated by the government, are looked upon as valuable property. This property is subject to taxation under the head of personal property.

3. SAME—WITHOUT ASSESSMENT TAXES ARE NULLITIES—ARBITRARY ASSESSMENT WITHOUT REFERENCE TO ACTUAL VALUE VOID.— Where it appears that the assessor arbitrarily listed mining claims at $500, without reference to the actual value thereof and without knowledge of such real value, such assessment cannot be upheld. Taxes by valuation cannot be apportioned without assessment. Moreover, it is the first step in the proceedings against individual subjects of taxation, and is the foundation of all which follows it. Without an assessment they have no support, and are nullities.

4. SAME—ASSESSMENT SHOULD BE OF TRUE CASH VALUE.—Assessment in this class of cases should be, as in all others, of the true cash value.

APPEAL from the County Court in and for the County of Pima. Affirmed.

The facts are stated in the opinion.

Hereford & Lovell, for Appellant.

The plaintiff is the owner of the patented mines mentioned in the complaint. The Government having parted with its

title to these properties for a valuable consideration, the plaintiff became the owner in fee thereof.

Lands sold by the United States are liable to taxation—lands sold by the United States can in no case be called the property of the United States. *Carroll* v. *Safford,* 3 How. 441; *People* v. *Shearer,* 30 Cal. 647.

Haynes & Styles, for Respondent.

Unpatented mining claims are not taxable; the taxing officers holding them to be exempt under Section 5, of Chapter 33, of the Compiled Laws, which contains an exclusion in terms.

We hold that the same exclusion applies to the patented as well as to unpatented claims.

Previous to 1875 the term "real estate" in the revenue law of the Territory included "mining claims." Compiled Laws of Arizona, 1864-1871, p. 312. And the "possession or right of possession to" such claims, as well as claims patented, was taxable. Our statute was copied from the Nevada statute. *Hale & Norcross Co.* v. *Storey Co.,* 1 Nev. 104; *Forbes* v. *Gracey,* 94 U. S. 762. This attempt to tax mining property like ordinary property was seen to be practically impossible and Nevada adopted a method for the Taxation of the Net Proceeds of Mines, which has been sustained by the courts of Nevada as a proper method of taxing such property. *State* v. *Kruttschnitt,* 4 Nev. 178.

In 1875 Arizona adopted the Nevada system, and at the same time it changed Sec. 5 of Chapter 33 to its present form, as did also the Nevada Legislature; and thereafter and until the repeal of the Net Proceeds Act in 1881, no one thought of attempting to tax any mine or mining claim specifically.

The repeal of the Net Proceeds Act did not strike out the exemption contained in the Revenue Act; it merely abolished that mode of taxation and established no other. Unpatented mining claims are not taxable and there is no difference in the estate of an unpatented claim and a patented one. They are recognized by the legislature as one and the same in all other provisions relating thereto. Chapter 27, Compiled Laws; Probate Laws, Chap. 29, Sec. 154; Statute of Limita-

tions, Compiled Laws, p. 361; Compiled Laws, Chapter 48, Sec. 263; Compiled Laws, p. 512; Compiled Laws, p. 513; Act No. 95, passed in 1881; also Act No. 91, 1881; Act No. 30, 1883.

To say that the Legislature intended to tax mining claims which are patented, and not the others, is to presume a premium offered to those who do not patent, which would be in contravention of the policy of the government, which desires to sell and finally dispose of its mineral lands, at the price fixed by law. *Hale & Norcross Co.* v. *Storey Co., supra.*

Whether any tax assessed would be legal or not, this particular tax is illegal, because there was no valuation, and without a valuation there is no assessment, and no tax can be levied or collected. Cooley on Taxation, pp. 258, 259, and notes; Desty on Taxation, Vol. 1, p. 546, Title Valuation; Compiled Laws of Arizona, Chap. 33, Secs. 8, 13 and 18.

The discrimination made between patented and unpatented claims, even if made by the legislature, would be void, as wanting both equality and uniformity, in the taxation of this class of property. Cooley on Taxation, p. 128, and note.

SHIELDS, C. J.—This case is submitted on the facts stated in the complaint. Two questions are before the court for decision: *First.* Whether, under the laws of Arizona, mining claims, for which patents have been issued by the United States, are taxable at all, or for any purpose. *Second.* Should it be decided that such mining claims are taxable, was there any legal or valid assessment of taxes on the mining claims of the plaintiff, the respondent herein, for the year A. D. 1885?

The portions of the complaint which raise these questions are the following: "That the plaintiff, at all the time hereinafter mentioned, was, and he now is, the owner of the following described mining claims, in said county of Pima, to wit: (1) The General Craig mining claim, in the Aztec mining district, covering 20.66 acres. (2) The Missouri mining claim, in the Aztec mining district, covering 20.66 acres. (3) The Whilden mining claim, in the Tyndall mining district, covering 20.66 acres. That said mining claims were

not and are not taxable, for any purpose whatever, under the laws of the Territory of Arizona.''

The complaint also properly alleges that the defendant was and is the treasurer and *ex officio* tax collector of the county of Pima; that, for the year 1885, Hiram S. Stevens was the county assessor of the county of Pima, and as such assessor unlawfully placed the three mining claims of the plaintiff upon his assessment list or roll, and assessed the value of each at the sum of $500; and further states the amount of taxes to be collected from each of such claims.

Paragraph 8 of the complaint is as follows: ''That the said Stevens, as such assessor, at the time of his said assessment, assessed but ninety-four mining claims for taxation, in said county of Pima; and wholly failed, neglected, and refused to assess other mining claims for taxation, although he well knew that there were many other such mining claims in said county equally subject to taxation with those of plaintiff, and with the ninety-one other mining claims so assessed; and that the said Stevens, further, did not value plaintiff's said mining claim for taxaiton, nor did he value any of the other ninety-one mining claims returned by him as assessed at $500 each; but said Stevens arbitrarily listed each and all of said ninety-four mining claims at the sum of $500, without reference or regard to the actual value of said mining claims, and without any knowledge of the real value thereof. And that said board of equalization wholly failed, neglected, and refused to place upon the said tax-list or assessment roll, or to certify for taxation, any mining claims other than those of the plaintiff, and the ninety-one others so assessed; although said board were informed officially, and knew, that there were many other mining claims in said county equally subject to taxation with those of the plaintiff, and the said ninety-one others. And plaintiff avers and charges that in listing property for taxation, and in assessing and levying upon the same, the said assessor, and the said board of equalization, and the said board of supervisors, unlawfully listed and assessed all mining claims in said county of Pima, for which a patent had been granted by the United States; and unlawfully and arbitrarily, and without right, assumed

and attempted to so list and assess only such patented mining claims, and wholly failed, neglected, and refused to so list or assess any other kind of mining claims in said county, although there were others; both said assessor and said board of equalization knew that there were many hundreds of unpatented mining claims in said county. And plaintiff avers and charges that by the said unlawful acts of said assessor, and said board of equalization, the whole of the burden of taxation upon the class of property known as 'mining claims,' in said county, was and is unjustly laid upon said patented mining claims, and said unpatented mining claims are left free from any taxation whatever.''

Other portions of the complaint set out with precision the proceedings to levy the tax in question, but the foregoing is deemed all that is necessary to guide for a disposition of the questions raised. These questions are important, and demand and have received serious consideration. A right disposition of them depends upon the correct construction of chapter 33 of the Compiled Laws of Arizona, which is the revenue law of the territory.

As the law now stands, the right to tax, if at all, must come from this chapter of the Compiled Laws. The act providing for the taxation of the net proceeds of mines, even if it ever had any validity, so far as it may have been in conflict with the revenue law,— (that act being prior in date to the revenue law,) was repealed by the legislature of 1881. It is important, therefore, to have in mind a clear understanding of the provisions of the revenue law as found in the chapter of the Compiled Laws to which reference has been made. For convenience, and that our views may be better understood, such provisions of the revenue law as bear upon the questions raised are referred to by us.

Section 4 provides that ''all property, of every kind and nature whatsoever, within this territory, shall be subject to taxation, except such property as is therein specially exempt.'' Then follows a list of such exempt property, consisting of property of a public nature, and such as is devoted to religious and educational purposes. But no property of a private character is exempt, except a certain

amount belonging to widows and orphans. Then follows section 5, as follows:

"Sec. 5. The term 'real estate,' whenever used in this act, shall be deemed and taken to mean and include, and it is hereby declared to mean and include, the ownership of, or claim to, or possession of, or right of possession to, any land within the territory; and the claim by, or possession of, any person, firm, corporation, association, or company, to any land, shall be listed under the head of 'real estate:' provided, that the term 'land,' as used in this section, shall not be so construed as to include mining claims, either lode or placer; the term 'personal property,' whenever used in this act, shall be deemed and taken to mean and include all household and kitchen furniture; all law, medical, and miscellaneous libraries; all goods, wares, and merchandise; all chattels, of every kind and description; all money on hand, or on deposit in bank or banks with individuals; all money at interest, secured by mortgage or otherwise;" and a large variety of other things, which are all works and improvements; and "all property of whatsoever kind or nature not included in the term 'real estate,' as said term is defined in this act."

The eighteenth section declares "that the assessor shall prepare a tax-list or assessment roll in the books furnished him by the board of supervisors, in which books he shall set down the real estate and personal property; and, among the things he is to do, he must write down "all improvements on public lands, describing as nearly as possible the location of such improvements."

The foregoing are the only provisions of the revenue law that it is deemed necessary to refer to in this controversy.

The present revenue law, to which the foregoing references are made, takes the place of chapter 33 of Howell's Code, which it repeals. Section 5 of that Code (Comp. Laws 1864, p. 312) provided that "the term 'real estate,' whenever used in this act, shall be deemed and taken to mean and include, and it is hereby declared to mean and include, the ownership of, or claim to, or possession of, or right of possession to, any land or mining claims, either lode or placer, within the territory; and the claim by, or possession of, any per-

son, firm, corporation, association, or company, to any land
or mining claims, either lode or placer, shall be listed under
the head of 'real estate.' " The term "personal property"
in the Howell Code is declared to include the same articles
as the same term in section 5 of the present revenue law;
and, indeed, all of section 5 in the Howell Code, except as
above quoted, is the same as the similar section in the pres-
ent law.

Now, after this somewhat lengthy reference to the present
and former revenue laws of the territory, we come to con-
sider what is meant by the expression "mining claim," in
the existing law, and the extent and purpose of the exemp-
tion with reference thereto contained therein. Clearly, the
law as it stands now was not intended to, and does not,
exempt from taxation mining property to which a patent
has actually been issued by the government of the United
States. Such a consideration as that would be in conflict
with the very act itself, which provides, as we have seen,
that "all property, of every kind and nature whatever,
within this territory, shall be subject to taxation, except"
in the cases enumerated.

There is nothing in the exceptions to justify the claim
that mines to which patents have been issued should not
be subject to taxation. Such property is clearly within the
definition of the word "lands," and also "real estate," in
chapter 1 of the Compiled Laws, which declares these words
"shall be construed to include lands, tenements, and real
estate, and all rights thereto and interests therein. In such
case the person to whom a patent issues becomes the abso-
lute owner of the property named in it, and as to such
property the government parts with all right and title there-
in. The grantee in such patent is an owner of "land" and
"real estate," just as much and as fully as the owner of
agricultural or other lands. That being so, the legislature
could never have intended that it should not bear its just
proportion of taxation. Neither does the revenue law ex-
empt from taxation, nor can it be construed so to do, min-
ing rights or claims, where the occupants or claimants have
paid to the proper officer of the United States the purchase
money therefor, although the patent may not have been

issued to them. By the payment of the money by him in such case, and its acceptance by the government, the land is his, the government of the United States only holding the legal title in trust for him. In such case the property is private property. To hold otherwise would encourage owners and occupants to delay calling for a patent for the very purpose of avoiding taxation. Such has been the construction given to these laws in California. *State* v. *Moore,* 12 Cal. 56; *State* v. *Shearer,* 30 Cal. 645.

The revenue laws of this territory do not, in terms, exempt such property from taxation; and as the interest acquired by the purchaser in such cases becomes a part of his individual property, it is as much subject to the taxing power of the territory as any other piece or article of property within its limits and protected by its laws. No property within the territory is exempt from the operation of these revenue laws, unless put beyond them designedly and unequivocally by the legislature or other sovereign power. A mere inference that certain property is exempt from taxation will never do, nor will it be assumed unless the language used is too clear to admit of doubt. *Gilman* v. *City of Sheboygan,* 2 Blackf. 510; *Iowa Homestead Co.* v. *Webster,* 21 Iowa, 221.

Judge Cooley declares the rule as follows: "The intention to exempt must in all cases be expressed in clear and unambiguous terms. Taxation is the rule, exemption is the exception. All exemptions are to be strictly construed. They embrace only what is within their terms." Cooley, Tax'n, 146.

In *Providence Bank* v. *Billings,* 4 Pet. 514, a leading case, Chief Justice Marshall says: "That the taxing power is of vital importance,—that it is essential to the existence of government,— are truths which it cannot be necessary to reaffirm. As the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear."

In *Philadelphia, etc., R. R. Co.* v. *Maryland,* 10 How. 376, Chief Justice Taney said: "This court on several occasions

has held that the taxing power of a state is never presumed
to be relinquished unless the intention to relinquish is de-
clared in clear and unambiguous terms.''

In *Vicksburg, etc., R. R. Co.* v. *Dennis,* 116 U. S. 665, 6
Sup. Ct. Rep. 625, in speaking of taxation, and the surren-
der thereof, Justice Gray, who delivers the opinion of the
court, says: ''It has been said that neither the right of
taxation, nor any other power of sovereignty, will be held
by this court to have been surrendered, unless such sur-
render is expressed in terms too plain to be mistaken: that
exemption from taxation should never be assumed unless
the language used is too clear to admit of doubt; that noth-
ing can be taken against the state by presumption or in-
ference. The surrender, when claimed, must be shown
by clear, unambiguous language, which will admit of no
reasonable construction consistent with the reservation of
the power. If a doubt arise as to the intent of the legisla-
ture, that doubt must be solved in favor of the state; that
a state cannot, by ambiguous language, be deprived of this
highest attribute of sovereignty; that any contract of ex-
emption is to be rigidly scrutinized, and never permitted to
extend, either in scope or duration, beyond what the terms
of the concession clearly require; and that such exemptions
are regarded as in derogation of the sovereign authority,
and of common right, and therefore not to be extended be-
yond the exact and express requirement of the grants con-
strued *strictissimi juris.''.* This case also holds that the
omission even for several years of the taxing officers to as-
sess a particular species of property, or impose a tax, is
of no importance, and cannot control the duty imposed by
law on their successor, nor the leagl construction of the law
by the courts.

These authorities fully sustain the position we take with
reference to the property named, and clearly show that such
property is taxable under the revenue law of the territory,
and is not within the exemption required, nor is it included
in the expression ''mining claims.''

It remains now to determine what is meant by the ex-
pression ''mining claims'' in the revenue law, and that we
proceed to do. There is a large class of cases where the

occupants of mining property do not claim any ownership whatever in the lands in their possession. They simply enter upon the public lands, and make improvements thereon. So far as the government is concerned, such persons may be and often are naked trespassers. The improvements, however, that they put upon the land, while tolerated in its possession by the government, are looked upon as valuable property interests, giving to their possessors not only a home, but oftentimes a large and lucrative income. The possession and interest of the possessors of such a holding, wherever that state of things exists, have always been treated as property; have been sold upon execution and judgments, and transferred by mortgage and otherwise.

In speaking of this class of property, the supreme court of California says: "The whole course of legislation and judicial decisions in this state since its organization has recognized a qualified ownership of the mines in private individuals. Contracts affecting mining claims have been constantly enforced. Remedies have been afforded to those whose possession has been disturbed, or whose claims have been trespassed upon, by others; and the right of the locator to sell, hypothecate, or in any manner dispose of his property in a mining claim has been upheld, as well by legislative enactment as by judicial decisions."

The history of legislation in this territory, and the most casual examination of such legislation, show most clearly that from the first a distinction has been made between mines and interests in mines. Nearly every mining law speaks of mines and mining interests in such a way as to clearly indicate that there was a distinction between the two well understood and recognized; mines being regarded as covering the two species of property first as referred to by us, and mining interests the latter.

Now, this property is also subject to taxation. It has been continually taxed elsewhere, as the California cases cited show. No one will contend that it is not within the power of the legislature to subject such property to taxation. The power to do so is undoubted and complete. Under the Howell Code such property and interests were taxed, but it is said that the revenue law which took the place of the

Howell Code exempts such property from taxation; and, indeed, the position is boldly asserted that mines absolutely owned, and to which patent has been issued, are also exempt under the present law. There is no foundation for such assertion in either instance. We have already shown the fallacy of such a position with reference to mines actually owned. No stronger claim can be made in favor of the exemption of mining claims, as we construe that expression to mean. The revenue law does not exempt, nor does it undertake to exempt, mining claims from taxation. It simply provides that the term "land," as used in the law, shall not be so construed as to include mining claims, either lode or placer. In this regard the present law changed the rule of taxation in force under the Howell Code, and left such property subject to taxation under the head of "personal property," as works and improvements upon public lands. The Howell Code, as it stood, left such property subject to taxation both as real estate and personal property. To avoid embarrassment, and a possible double taxation, the present law prohibited the taxation of such property as real estate.

Upon the authorities cited, that before individual property shall be declared free from taxation the exemption therefrom in the revenue law must exist in clear and unambiguous terms, we might leave this question, for such exemption does not here exist. The same question, however, has been discussed elsewhere, and judicial decisions similar to this one we pronounce are not wanting.

Thus, the supreme court of Illinois says: "The general government still retains the title to a large proportion of the land in many of our populous and wealthy counties, on which are permanent improvements of great intrinsic value, and hence the necessity of passing laws adapted to property thus peculiarly situated. To allow a class of persons to hold and enjoy large fortunes beyond the reach of their creditors was too shocking to a sense of justice to allow it to pass unnoticed by the legislature, and consequently it has, by repeated acts, treated these improvements as the proper subjects of transfer and ownership. They are made sufficient consideration for contracts and promises. Lands thus owned

and occupied are treated as proper subjects for action of trespass, forcible entry and detainer, forcible detainer, and ejectment; and, indeed, they are throughout treated as the property of the individuals possessing them; and, as such, they are subject to the control and disposition of the law, so far as the occupant is concerned, as much as if he owned the fee, except, however, that no disposition can be made of them so as to affect in any way a title which may be derived from the United States. In cases of ejectment for these claims, it is only necessary for the plaintiff to deduce a regular title from the first occupant, (unless his claim has been abandoned,) who is considered as the fountain of his title, which will prevail, unless opposed by a government title, when it vanishes. Upon such titles depend the security of extensive plantations, and some of the largest manufactories, mills, and machinery in the state. Such is the situation of many populous villages and flourishing towns." *People* v. *Shearer,* 30 Cal. 656.

These observations apply with cogency and force to the condition of affairs in this territory. See, also, *Thredgill* v. *Pintard,* 12 How. 36.

In *People v. Shearer,* 30 Cal. 656, the court says: "These possessions, then, are recognized as a species of property subsisting in the hands of the citizen. It is not the land itself, nor the title to the land, nor is it the identical estate held by the United States. It is not the pre-emption right, but is the possession and valuable use of the land subsisting in the citizen. Why should it not contribute its proper share, according to the value of the interest, whatever it may be, of the taxes necessary to sustain the government which recognizes and protects it?" The same case holds that a mining claim must stand on the same footing with a claim for agricultural purposes.

No further discussion is deemed necessary in stating our views upon the question of what mines and mining interests are taxable under the revenue law.

The other question raised by the record yet remains, and that may be disposed of more briefly. It is admitted that the manner of making the assessment in this case is correctly stated in the complaint. It is too plain for discussion that

no such assessment can be upheld. It violates every ruls upon which taxation proceeds, and leaves everything to depend on the arbitrary will of the assessing officer. The facts stated show, not an assessment, but an arbitrary exaction. In his admirable work on taxation, Judge Cooley says of an assessment: "Taxes by valuation cannot be a portion without it. Moreover, it is the first step in the proceedings against individual subjects of taxation, and is the foundation of all which follow it. Without an assessment they have no support, and are nullities." The law requires the assessor to ascertain, "by diligent inquiry and examination," all property subject to taxation; "then determine the full cash value" thereof. Clearly, nothing of the kind was attempted here. *Wattles* v. *Lapeer*, 40 Mich. 624; *Dickson* v. *Reynolds*, 48 Mich. 158; 12 N. W. 24.

In conclusion, we may remark that the assessment in this class of cases should be, as in all others, of the true cash value.

For the want of an assessment, under the law, the decree below was properly granted, and will be affirmed.

Barnes and Porter, JJ., concur.